UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
CIVIL NO. 20-1787(DSD/DLM)

Joseph Paul Baker,

       Plaintiff,

v.                                                    **ORDER**

The City of Woodbury; John
Wallgren, individually and in
his official capacity; Chris
Klein, individually and in
his official capacity; and J.B.
Guiton, individually and in
his official capacity,

       Defendants.


    Kenneth U. Udoibok, Esq. and Kenneth Ubong Udoibok, P.A.,
    The Flour Exchange, Suite 5010, 310 4th Avenue South,
    Minneapolis, MN 55415, counsel for plaintiff.

    Vicki A. Hruby, Esq. and Jardine Logan & O'Brien PLLP, 8519
    Eagle Point Boulevard Suite 100, Lake Elmo, MN 55042,
    counsel for defendants.


This matter is before the court upon the motions for summary judgment and to exclude expert testimony by defendants City of Woodbury (City), John Wallgren, Chris Klein, and J.B. Guiton. Based on a review of the file, records, and proceedings herein, the court grants the motion for summary judgment and denies the motion to exclude expert testimony as moot.[1]

---

[1] Plaintiff Joeseph Baker argues that defendants exceeded the dispositive motion word-count limitation by filing two

**BACKGROUND**

This action brought under 28 U.S.C. § 1983 arises out of plaintiff Joseph Baker's employment with the City as a paramedic. The City hired Baker in June 2018. Baker Dep. at 58:14-19. In addition to the requisite certifications and emergency medical skills, the City required paramedics like Baker to (1) demonstrate "effective written and oral communication skills[;]" (2) "accept criticism and/or discipline;" (3) "promote a cooperative atmosphere in the department;" (4) "have a positive attitude;" (5) engage maturely with colleagues; and (5) "work effectively and respectfully with department heads, elected officials, staff, and other

---

dispositive motions. ECF No. 145, at 1 n.1 Defendants filed one motion for summary judgment and one motion to exclude expert testimony. Defendant are permitted to separately brief such motions and properly did so here. Baker, however, effectively exceeded his word-count limitation in opposition to defendants' motion for summary judgment by filing a 5,972-word opposition memorandum and a 9,748-word affidavit. Parties may not circumvent word-count limitations through narrative affidavits. See BMC Software, Inc. v. Mahoney, No. 15-cv-2583, 2015 WL 3616069, at *1 n.1 (D. Minn. June 9, 2015) (noting that it is "contrary to the spirit, if not the letter," of Local Rule 7.1(f) to exceed the 12,000 word-count limit by filing a lengthy affidavit that serves as a fact section). The court will consider the affidavit only to the extent it does not contradict facts otherwise in the record. See Herring v. Canada Life Assur. Co., 207 F.3d 1026, 1030 (8th Cir. 2000) (holding that a party "cannot create a 'sham' issue of fact in an effort to defeat summary judgment by filing an affidavit directly contradicting prior deposition testimony"); Conolly v. Clark, 457 F.3d 872, 876 (8th Cir. 2006) ("[A] properly supported motion for summary judgment is not defeated by self-serving affidavits.").

agencies[.]"  Hruby Decl. Ex. 1, at 2-3; <u>see also</u> Baker Dep. at 58:23-61:16.  Baker understood that he would be assessed on how well he performed these essential job duties.  Baker Dep. at 61:17-21.

Baker was supervised by Emergency Medical Services (EMS)/Fire Commander Chris Klein.  Klein Dep. at 10:12-15; Baker Dep. at 137:10-12.  Klein, in turn, reported to EMS/Fire Chief John Wallgren.  Wallgren Dep. at 7:12-15.  Guiton was the Emergency Medical Services (EMS) Commander and also reported to Wallgren.  <u>Id.</u> at 9:2-8.  As EMS Commander, Guiton was responsible for training in the EMS/Fire department.  <u>Id.</u> at 34:9-17.

## I.  Education Group

At Guiton's suggestion, Baker joined the EMS education group in October 2018, after he completed field training.  Baker Dep. at 80:8-15, 86:20-25; Wallgren Dep. at 34:2-3.  Baker understood that he could choose not to join the group without negative consequences, as it was a voluntary position.  Baker Dep. at 78:18-21; <u>see also</u> Trembley Dep. at 13:3-11.

In this role, which was under Guiton's command, Baker facilitated, selected, and conducted paramedic training, along with his colleagues Kevin Asauskas and Lauren Trembley.  Baker Dep. at 80:8-25; Asauskas Dep. at 9:17-10:16; Trembley Dep. at 11:11-12:9; Guiton Dep. at 21:19-22:4.  The education group also

assessed and maintained training documentation for submission to the Emergency Medical Services Regulatory Board (EMSRB). Trembley Dep. at 13:18-14:7.

As a member of the education group, Baker had access to the National Registry of Emergency Medical Technicians (NREMT) records for each EMT employed by the City. Baker Dep. at 85:11-86:9. He would not otherwise have had such access. Id. at 86:10-19. Baker maintains that because he served on the education group voluntarily, he did so as a "concerned ... private citizen," rather than in his capacity as a City employee. Id. at 84:22-85:4. There is no evidence in the record that any Woodbury citizen could have served on the education committee absent corresponding employment with the City.

## II.  January 2019 Performance Appraisals

In January 2019, Baker underwent a six-month evaluation that included a performance appraisal submitted by Klein and a self-appraisal. Hruby Decl. Ex. 10. Klein positively assessed Baker's performance, commenting that Baker "has an excellent working relationship with his crew members, which gives him the potential for significant positive influence among his peers." Id. at 4. He also noted that Baker has "solid" technical ability with a "strong potential for excellence." Id. Baker

also received positive reviews for his work in the education group. Id.; Baker Dep. at 113:10-16.

In his self-appraisal, Baker noted that he could improve in several areas – only one of which was considered an area of improvement by Klein – including leadership, technical skills, safety, employee involvement, and mentorship. Hruby Decl. Ex. 10 at 6; see also id. at 2-3. Baker believes that his January 2019 self-assessment was later used to retaliate against him for raising concerns about training records, which he discovered through his work on the education group. Baker Dep. at 103:16-04:19, 106:7-25, 108:14-23.

## III. Alleged Training Deficiencies

On May 13, 2019, Baker told his education group colleagues that he believed there were deficiencies in training records submitted to NREMT. Hruby Decl. Ex. 14; Asauskas Dep. at 11:8-16; Baker Dep. at 127:20-28:1. Baker was concerned that paramedics may not have attended proper or sufficient courses to maintain their required certifications. Asauskas Dep. at 33:1-4. Asauskas recommended that Baker raise the issue with Guiton. Id. at 13:23-14:6, 33:9-11.

Baker proactively contacted Regions EMS department to arrange for a refresher course before he met with Guiton and the other members of the education group to discuss the perceived training deficiencies. Baker Dep. at 158:1-9, 159:9-13. When

Baker called Regions, he said that he did not want the City's EMS training records to be "perceived as inappropriate or fraudulent." Id. at 158:12-17. Asauskas was aware that Baker planned to call Regions, but their superiors were not. Id. at 162:12-21.

Unbeknownst to Guiton, Baker also sent an email raising concerns about paramedic training to Dr. Burnett, the City's medical director, a Regions Hospital emergency room physician, and an EMSRB board member. Burnett Dep. at 45:1-46:1; Guiton Dep. at 117:11-20. Baker believed that Dr. Burnett could be helpful because he was familiar with EMS training records, requirements, and protocols. Baker Dep. at 182:19-83:10. Baker explained that he called Regions the day before to inquire about possible refresher courses due to errors in education reporting. Hruby Decl. Ex. 15, at 1. He detailed the perceived training deficiencies and his concern that they could affect necessary certifications. Id. at 1-2. He also denied that he was accusing the City of engaging in fraudulent practices, although he noted that it was a "concern" of his.[2] Id. at 1. Dr. Burnett

---

[2] Baker now claims that he reported the alleged training deficiencies to Dr. Burnett as a whistleblower. Baker Dep. at 195:10-17. He admits, however, that he did not file a complaint with the EMSRB or any other agency. Id. at 195:24-98:4. He now also claims that he made the report to Dr. Burnett "as a concerned citizen, looking out for the City of Woodbury, [his] colleagues and [himself]." Id. at 228:15-21.

responded by asking Baker to include his chain of command on any email communications with him.   Hruby Decl. Ex. 4; Burnett Dep. at 54:25-55:17.   Dr. Burnett acknowledged, however, that some of the concerns raised could implicate the EMSRB board, which oversees paramedic certification.   Burnett Dep. at 46:13-17.

Dr. Burnett then spoke with Guiton about Baker's email. Burnett Dep. at 47:16-48:5.   Dr. Burnett recommended that Guiton self-report the issues to the EMSRB board in "abundance of transparency."   Id. at 49:3-7.   Guiton responded that he was aware of Baker's concerns and would investigate.[3]   Id. at 48:7-13.

On May 29, 2019, Baker emailed Guiton explaining why he contacted Regions about his certification concerns but denying that he reported fraud by the City.   Hruby Decl. Ex. 16.   The two later met in person and, according to Baker, Guiton was upset that Baker independently contacted Dr. Burnett.   Baker Dep. at 129:3-6, 132:2-24.   Baker alleges that Guiton leaned towards him and said, "You're lucky I couldn't get my hands around your throat on Thursday."   Id. at 129:3-6, 132:2-24. Baker explained that he was simply trying to arrange for a

---

[3] Guiton later reported to Dr. Burnett that Baker's concerns were unfounded and that there were no underlying training issues.   Guiton Dep. at 124:9-28:7.   Guiton also reported that he notified the EMSRB board of the issues raised in Baker's email.   Burnett Dep. at 49:8-16.

refresher course through Dr. Burnett so that the training records were accurate.  Id. at 129:15-18.  Guiton told Baker to "take care of it," which Baker interpreted to mean that he should falsify recertification records.[4]  Id. at 149:5-25.

Baker reported Guiton's threat to Klein and Wallgren the next day.  Baker Dep. at 135:9-23, 137:6-20.  Wallgren reported the alleged threat to the City's human resources department (HR).  Wallgren Dep. at 63:2-6.  Wallgren also spoke to Guiton, who denied threatening Baker, but admitted that he was disappointed that Baker took an internal matter to a third party.  Wallgren Dep. at 62:2-22.  Wallgren reminded Guiton to maintain his professionalism.  Id. at 63:17-24.  HR also spoke with Guiton and told him to be cautious about how he speaks with staff.  Guiton Dep. at 121:5-22.

In September 2019, Wallgren met with Baker, Trembley, and Asauskas to discuss concerns about the training records.  Wallgren Dep. at 29:22-30:7, 35:9-22, 36:20.  Wallgren asked them to provide more specific information in writing, which Baker did soon thereafter.  Id. at 30:2-7, 35:5-8; 36:13-15; 42:22-43:3.  Wallgren then met with Guiton to relay Baker's

---

[4]   Soon after he joined the education group, Baker was warned by another paramedic not to "do anything with paramedic training records" if asked to so do by Guiton because "there was a possibility that they would not be legitimate."  Baker Dep. at 90:4-16.  Although this so-called warning is rather vague, the conversation may have led Baker to jump to the conclusion that Guiton wanted him to falsify records.

concerns.  Id. at 34:9-17, 42:3-7.  Guiton told Wallgren that the matter was being addressed.  Id. at 42:13-16.

Despite his ongoing concerns about training records, Baker is unaware of any paramedic who lacked proper certification at any time during his tenure with the City.  Baker Dep. at 77:21-78:2.

### IV.  June 2019 Performance Appraisal

In Baker's June 2019 review, Klein noted that Baker needed to improve with respect to safety and problem/conflict resolution.  Hruby Decl. Ex. 12, at 2.  As to the latter, Klein commented that Baker should "[s]eek solutions to eliminate workplace/group drama by providing realistic/concrete solutions, while being flexible with co-workers/supervisors insight."  Id. at 4.  Klein also commented that Baker should "exclude himself from the workplace 'drama'" to allow him to maintain focus.  Id. at 3.

### V.  Shooting Incident

In July 2019, Baker responded to the scene of an officer-involved shooting.  Baker Dep. at 245:12-18.  According to Baker, Wallgren was so upset that so many of the City's ambulances were unavailable to take other emergency calls that he called those on the scene to complain.  Id. at 245:19-22.  Baker alleges that Wallgren's conduct disrupted patient care.  Id. at 245-22-46:12.

Baker complained to Klein about Wallgren. Id. at 246:16-23. He also complained that he felt that the department was, at times, intentionally understaffed. Id. at 252:2-21. Baker believes that his concerns about this incident factored into his perceived performance issues, but there are no supporting facts in the record.

Baker's colleagues reported to Klein that Baker had become "disruptive" due to his belief that the issues he raised about the officer-involved shooting were not being addressed. Klein Dep. at 35:15-36:25. Baker accused Klein of not being available to address his concerns. Id. at 41:1-25.

## VI. Ketamine Incident

On September 22, 2019, Woodbury Police Sergeant and certified paramedic Tom Ehrenberg responded to a call involving someone in a mental health crisis. Ehrenberg Dep. at 5:8-6:24, 10:2-11, 13:6-9. Paramedics were also called, among them Baker. Id. at 14:16-15:2.

Ehrenberg observed that the person was "extremely volatile." Id. at 15:8-12, 27:16-18. As a result, he asked Baker to prepare a sedative in the form of Ketamine to calm the person, if needed. Id. at 15:16-16:11. According to Ehrenberg, Baker's "body language indicated that he was not prepared and not willing" to do so. Id. at 16:14-16. Ehrenberg and his partner were ultimately able to remove the person from the scene

10

without the use of a sedative.  Id. at 21:8-22:8, 30:3-25, 34:18-19.

Ehrenberg denies that he instructed Baker to administer ketamine, and maintains that he simply wanted it to be ready if it was needed.  Id. at 29:20-30:2; see Hawkinson Dep. at 24:4-10 (testifying that Ehrenberg asked paramedics to have the ketamine "drawn up" due to safety concerns); see id. at 38:9-13 (testifying that Ehrenberg did not order Baker to administer ketamine).  Ehrenberg felt that he and Baker could have communicated more effectively.  Ehrenberg Dep. at 35:5-15.

Baker was upset that Ehrenberg put him in a position to administer Ketamine when he had not been able to personally assess the patient.  Id. at 36:15-24.  At the time, Baker did not know that Ehrenberg was also a paramedic and therefore able to assess the patient's need for ketamine.  Id. at 36:12-14. Ehrenberg asked to speak with Baker after the incident.  Id. at 37:11-17.  A witness observed the conversation and described it as "pretty intense" and an "argument."  Hawkinson Dep. at 37:19. The conversation ended well, however.  Id. at 37:20-23.

Baker admits that Ehrenberg simply asked him to have ketamine ready and that he was not ordered to administer ketamine.  Id. at 261:1-9, 264:3-17, 270:1-9.  Baker nevertheless complained to Klein about the incident.  Id. at 273:8-13.

11

Baker claims that "on a number of occasions," another unidentified paramedic directed Baker to "get [his] ketamine ready" before he was able to assess the patient. Baker Dep. at 255:9-15. Baker refused each time. Id. at 15-17. He now contends, without factual support, that the City commonly forces ketamine on its citizens. See Compl. ¶¶ 92-93.

## VII. Performance Improvement Plan

On November 19, 2019, Klein placed Baker on a Performance Improvement Plan (PIP) due to his increasingly poor attitude and communication. See Hruby Decl. Ex. 37; Brown Dep. at 8:12-25; Klein Dep. at 34:21-24. Baker's attitude began to change in the summer of 2019. Wallgren Dep. at 14:16-21. When he was first hired, Baker was "very warm," "very excited," "engaged," and "motivated." Id. at 15:19-23. By the summer of 2019, however, Baker became "cold" and "short" in his communications with Wallgren and his peers. Id. at 15:8-16:24. Baker also failed to communicate regularly with Klein between July and October 2019, and did not communicate properly through his chain of command when addressing perceived EMS training issues. Klein Dep. at 40:15-20, 58:5-59:20. Klein denies that Baker was placed on the PIP because of his concerns about the EMS training records. Id. at 87:10-20, 97:13-18.

In discussing the PIP recommendation with Wallgren and HR, Klein explained that Baker had become persistently focused on

the paramedic certification issue.   Hruby Decl. Ex. 31.
Notwithstanding that, Kelin did not believe that the PIP would
implicate Baker as a whistleblower with respect to EMT
certifications, as he had other issues, like "unfavorable
interactions" with co-workers.[5]  Id.

Wallgren and Klein met with Baker to discuss the PIP on
November 19, 2019.[6]  Wallgren Dep. at 12:6-13.  Neither viewed
the PIP as disciplinary in nature.  Id. at 14:2-5; Klein Dep. at
47:14-17.

At the meeting, Klein explained that the PIP was due to
Baker's ongoing need to improve in the following areas: (1)
problem/conflict resolution, (2) cooperation/safety, and (3)
communication.[7]  Hruby Decl. Ex. 37, at 1.  The PIP states that
Baker was required to make immediate changes and that failure to
do so could be met with disciplinary action.  Id. at 2.  As

---

[5]   The email in which Klein made these comments reads as
follows:  "I just want to make sure that my response to placing
Joe on a PIP would reflect as him being a 'whistleblower' for
the EMS education matter."  Id.  In his deposition, Klein
explained that his email included a typo because he meant to say
that the PIP would not reflect that Baker was a whistleblower.
Klein Dep. at 85:3-14.

[6] Wallgren did not take part in drafting the PIP.  Wallgren
Dep. at 11:15-12:3.  Guiton did not participate in the PIP
meeting.  Baker Dep. at 278:13-16.

[7]   The PIP does not reference Baker's allegations about
ketamine, the officer-involved shooting, or intentional
understaffing.  See Hruby Decl. Ex. 37; Baker Dep. at 284:24-
85:9.

reflected in the PIP, the City was not concerned about Baker's ability to treat patients, but rather his "attitude" and the fact that he was causing "a disruption within the organization and his coworkers." Id. at 13:6-12. Indeed, Wallgren described Baker as a "very good medic." Id. at 13:6. The PIP was designed to help Baker "reengage[]" and communicate more effectively with colleagues. Id. at 13:19-14:1.

With respect to problem/conflict resolution the PIP required Baker to schedule weekly meetings with Klein "to discuss accomplishments, issues and/or opportunities from the previous and upcoming shifts." Hruby Decl. Ex. 37, at 3. As to cooperation/safety, the PIP required Baker to schedule monthly meetings with Guiton "to perform a review of previous calls and/or EMS procedures that have been performed." Id. Similarly, as to communication issues, Baker was required to schedule a monthly meeting with an on-duty Woodbury Police Sergeant. Id. at 5.

Baker claims that Klein told him that he was placed on a PIP for refusing to administer ketamine. Baker Dep. at 282:1-4. Other than Baker's testimony on this point, however, there is no evidence in the record supporting his contention. The PIP does not mention the ketamine incident and there are no emails or other documents that mention the incident vis-à-vis the PIP.

Baker was upset that the PIP referenced his personal appraisals from January 2019. Baker Dep. at 285:23-86:18. He maintains that he would not have listed any areas of improvement had he known they would lead to a PIP. Id. at 286:24-87:5. Defendants deny that Baker's January self-appraisal had anything to do with the November PIP.

**VIII.   Post-PIP Complaint**

The evening of the PIP meeting, Baker sent an email to HR complaining that he was being mistreated due to his reports regarding certification deficiencies. Hruby Dec. Ex. 38, at 2. He claimed that his concerns went unaddressed and that he was frustrated by the lack of response given that EMS certifications were in jeopardy. Id. He was also frustrated that Guiton was his primary point of contact as to certification issues. Id. He requested a meeting with HR and the City Administrator to address his "mistreatment." Id. at 3. The next morning, HR manager Brown responded that she would review Baker's concerns with the public safety director and provide a response "in the near future." Id. at 1.

On November 30, Baker asked Ehrenberg to meet monthly as part of his PIP. Hruby Dec. Ex. 29. He also apologized for any ongoing tension over the ketamine issue. Id. Ehrenberg responded that their issue was resolved amicably and that he was happy to meet with Baker. Id.

On December 10, Brown responded to Baker's complaint.
Hruby Decl. Ex. 36, at 3. She noted that the PIP was not a
"disciplinary action" and that the PIP was appropriate, easily
achievable, and did not constitute mistreatment. Id. at 1.

On the issue of certification deficiencies, she responded
that his concerns were unfounded and that the City was
undergoing an audit to confirm that finding. Id. at 4. With
respect to problem/conflict resolution, Brown noted that Baker
showed a "[c]onsistent negative attitude," gave his supervisor
"the silent treatment," and responded angrily to a police
sergeant's directive. Id. at 5.

As to Baker's required meetings with Guiton, Brown
concluded that Wallgren should also attend the meetings, given
Baker's history with Guiton. Id. at 4; Baker Dep. at 142:10-16.
Despite this change, Baker contends that the City condones
physical threats because he was initially required to meet with
Guiton one-on-one. Baker Dep. at 140:6-41:8.

## IX.  New Employment

On November 20, 2019, the day after the PIP meeting, Baker
applied for, and was later offered, an EMT position elsewhere.
Hruby Decl. Ex. 39. On December 5, before HR could complete its
investigation, Baker submitted his resignation and two weeks'
notice to the City. Hruby Decl. Ex. 44; Baker Dep. at 304:8.
The City accepted his resignation, later determining that Baker

16

was not eligible for re-hire due to his communication issues. Klein Dep. at 93:1-13.

## X.   This Action

Baker commenced this action on August 17, 2020, alleging that (1) Wallgren, Klein, and Guiton retaliated against him for exercising his First Amendment right to free speech; (2) the City infringed on his civil rights by failing to adequately train, supervise, and discipline its employees in violation of Monell v. Department of Social Services, 436 U.S. 658 (1978), thus leading to the First Amendment violation; and (3) the City violated the Minnesota Whistleblower Act (MWA), Minn. Stat. § 181.932, by constructively discharging him after he complained about paramedic training records.   He seeks compensatory and punitive damages, as well as expungement of any adverse personnel records and an order enjoining the City from its "practice of coercing paramedics to sedate unwilling citizens." ECF No. 1, at 29.   Defendants now move for summary judgment and to exclude expert testimony.

### DISCUSSION

## I.   Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R.

Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material only when its resolution affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  See id. at 252.  On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party.  Id. at 255.

The nonmoving party, however, may not rest on mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial.  Celotex, 477 U.S. at 324.  A party asserting that a genuine dispute exists - or cannot exist - about a material fact must cite "particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial.  Celotex, 477 U.S. at 322-23.

## II.  First Amendment Claim

Baker claims that defendants Wallgren, Klein, and Guiton retaliated against him for questioning the EMS training records and complaining about Ehrenberg's request to prepare ketamine by

placing him on a PIP, in violation of his right to free speech under the First Amendment.

To establish a First Amendment retaliation claim, a public employee, such as Baker, must show that: "(1) he engaged in activity protected by the First Amendment; (2) the defendants took an adverse employment action against him; and (3) the protected conduct was a substantial or motivating factor in the defendants' decision to take the adverse employment action." Lyons v. Vaught, 875 F.3d 1168, 1172 (8th Cir. 2017). All three factors are at issue here.

**A.   Protected Activity**

"First Amendment protection of a public employee's speech depends on a careful balance 'between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs.'" Id. (quoting Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)).   Generally speaking, public employees do not "relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." Connick v. Myers, 461 U.S. 138, 140 (1983).

To determine whether the employee engaged in speech protected by the First Amendment, the court must first consider whether "the employee spoke as a citizen on a matter of public

concern." Garcetti v. Ceballos, 547 U.S. 410, 418 (2014). "If the answer is no, the employee has no First Amendment cause of action based on his ... employer's reaction to the speech." Id. If the answer is yes, then a First Amendment claim may be viable if the government entity lacked an "adequate justification for treating the employee differently from any other member of the general public." Id.

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline .... Restricting speech that owes its existence to a public employee's 'professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. Id. at 421–22. "The critical question ... is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." Lane v. Franks, 573 U.S. 228, 240 (2014). "[D]etermining the scope of an employee's official duties for these purposes is a practical inquiry that focuses on 'the duties an employee actually is expected to perform,' rather than his formal job description. McGee v. Pub. Water Supply Dist. #2, 471 F.3d 918, 921 (8th Cir. 2006) (quoting Garcetti, 457 U.S. at 424–25). "A public employee's speech is not protected by the First Amendment if it

'owes its existence' to his professional responsibilities." Id. (quoting Garcetti, 457 U.S. at 421).

So, the question presented is whether Baker's stated concerns about the EMS training records and Ehrenberg's request for him to prepare ketamine were made within the scope of his duties.  The record establishes that they were, despite Baker's insistence that he was acting simply as a concerned citizen regarding both matters.

When Baker made statements about the training records, the undisputed facts show that he did so within the scope of his duties as a member of the education group.  In that role, Baker was responsible for, among other things, assessing and maintaining training documentation for submission to the EMSRB. Baker discovered the alleged deficiencies when carrying out those duties.  He would not have been able to make such a discovery without access to the training records of each paramedic, along with their corresponding certifications.  It is undisputed that those detailed records are not available to the general public.  Further, Baker reported the alleged deficiencies to his superiors after first discussing it with his fellow education group members, thus tying his concerns directly to his role in the education group rather than merely as a concerned citizen.  Under these circumstances, there is no serious debate that Baker's speech owes its existence to his

21

professional responsibilities and therefore is not protected by the First Amendment.

The fact that Baker voluntarily agreed to serve in the education group does not change the court's analysis. Once he became a member of the group, he had specific responsibilities, including education programming and training documentation, both of which were at issue in his complaints. His concerns about those matters arose directly from his role in the education group and he attempted to resolve them as a member of that group.

And, although he now claims that he spoke to Dr. Burton as a concerned citizen rather than a City employee, his email to Dr. Burton does not support this assertion. The email explains Baker's perceived issues with training records and seeks ways to correct those records. See Hruby Dec. Ex. 15. He does not say that he is making a report as a citizen or employee, and specifically notes that his "intention was not to make accusations but to find a solution to the issue." Id.

As to the ketamine incident, Baker complained to Klein after Ehrenberg asked to draw up ketamine. This occurred squarely within Baker's role as an EMT and he makes no credible claim to the contrary.

Accordingly, Baker's speech is not protected by the First Amendment and his claim fails on this basis alone.

22

**B.   Adverse Employment Action**

Even if Baker's complaints were made as a concerned citizen rather than a member of the education committee or as an EMT, he has failed to establish that he suffered an adverse employment action.

"An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." Clegg v. Ark. Dep't of Corr., 496 F.3d 922, 926 (8th Cir. 2007) (citation omitted).  Adverse employment actions typically include "[t]ermination, cuts in pay or benefits, and changes that affect an employee's future career prospects" and "circumstances amounting to a constructive discharge."  Id. (citation omitted).

Baker claims that he suffered two adverse employment actions: (1) the PIP, and (2) constructive discharge.  The facts do not support either claim.

First, a "PIP alone does not constitute an adverse employment action." Fiero v. CSG Sys., 759 F.3d 874, 880 n.2 (8th Cir. 2014).  "[T]his rule applies with particular force to PIPs that are reasonable and/or minimally onerous." Bernard v. St. Jude Med. S.C., Inc., 398 F. Supp. 3d 439, 461 (D. Minn. 2019).  There is no serious dispute that the PIP here was both reasonable, minimally onerous, and easily achievable.  The PIP was narrowly tailored to address Baker's attitude and

communication issues. It required Baker to meet weekly with Klein, monthly with Guiton (later amended to meet monthly with Guiton and Wallgren), and monthly with a police sergeant.

Even if these meetings could be considered a change in his duties working conditions, which the court would be hard pressed to find, they were minor changes that were actually beneficial to Baker. See Higgins v. Gonzales, 481 F.3d 578, 584 (8th Cir. 2007) ("Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not" rise to the level of an adverse employment action."). Indeed, Baker was keen to increase his communications with his superiors, which these meetings allowed him to do on a regular basis. See Baker Dep. at 288:15-22.

Baker suggests that the PIP was onerous because it required him to meet one-on-one with Guiton despite their difficult interaction months prior. But HR readily made a change to that requirement to add Wallgren as a participant to the meetings once it was called to their attention. This change shows that the meeting requirement was a simple oversight rather than an attempt to adversely affect Baker's employment.

Baker next argues that he was constructively discharged because he was subject to a hostile work environment. He also

bases this argument on the requirement that he meet with Guiton, who threatened him six months prior.

"To establish a case of constructive discharge, [a plaintiff] must show that (1) a reasonable person in [his] situation would find the working conditions intolerable, and (2) the employer intended to force [him] to quit." Rester v. Stephens Media, LLC, 739 F.3d 1127, 1132 (8th Cir. 2014). A claim for constructive discharge requires considerably more proof than an "unpleasant and unprofessional environment." Jones v. Fitzgerald, 285 F.3d 705, 716 (8th Cir. 2002). "A constructive discharge arises only when a reasonable person would find the conditions of employment intolerable." Tidwell v. Meyer's Bakeries, Inc., 93 F.3d 490, 494 (8th Cir. 1996) (citation omitted). To act reasonably, however, "an employee has an obligation not to assume the worst and to jump to conclusions too quickly." Id. (citation omitted). "[C]onstructive discharge claims fail as a matter of law where the employee has not given the employer a reasonable opportunity to correct the intolerable condition before the employee quits." Lisdahl v. Mayo Found., 633 F.3d 712, 719 (8th Cir. 2011) (citations omitted).

Baker has failed to establish that he was constructively discharged. He argues that Guiton's single threat, coupled with the PIP, constituted constructive discharge. He characterizes

the threat as creating a hostile work environment, particularly
given that the PIP required him to meet one-on-one with Guiton.
But a hostile work environment does not exist when the
"offensive conduct consists of offhand comments and isolated
incidents." Bainbridge v. Loffredo Gardens, Inc., 378 F.3d 756,
759 (8th Cir. 2004) (citation omitted).   There is no question
that Guiton's threat was an isolated incident.   That said, it
was far from ideal for the PIP to require Baker to meet alone
with Guiton given their history.   Baker appropriately raised
this issue with HR, but before it could be resolved, he
submitted his resignation.   After his resignation, but before
his last day, HR agreed with Baker that it would be
inappropriate to require him to meet with Guiton and made
appropriate changes to the PIP.   Under these circumstances,
Baker did not give the City a reasonable opportunity to correct
the issue, which precludes a finding of constructive discharge.

In addition, there is no evidence to support a finding that
defendants intended to force Baker to quit.   There are no
emails, documents, or deposition testimony that even hint at any
such intention.

To the extent Baker bases this claim on the fact that the
City determined that he was ineligible for rehire, the court is
unpersuaded.   The City made that determination after Baker

resigned and began working elsewhere.  As a result, it had no bearing on the conditions of Baker's employment.

### C.  Causal Connection

There is also no causal connection between Baker's speech and the alleged adverse employment action.  Other than Baker's belief, there is no evidence that the PIP was designed to retaliate against him for his statements.  Rather, the PIP and other relevant documents provide no basis for concluding that defendants designed the PIP to retaliate against him.  The record is replete with examples of Baker's attitude and communication issues that amply support the need for a PIP.[8]

### III. **Monell** Claim

Baker argues that the City violated Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978), by ignoring employee complaints, violating standards in patient care and training, and retaliating against employees for exercising their constitutional rights.  His claim is untenable.

Under Monell, "a municipality may be held liable for the unconstitutional acts of its officials or employees when those acts implement or execute an unconstitutional municipal policy or custom."  Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999).  To establish municipal liability under § 1983 a

---

[8]   Given that plaintiff has failed to establish a claim under the First Amendment, the court will not consider arguments relating to qualified immunity.

plaintiff must demonstrate that a municipal policy or custom was the "moving force [behind] the constitutional violation." Id. at 694.   In other words, where there is no constitutional violation, there can be no liability under Monell.

As discussed above, Baker has failed to establish a violation of his First Amendment rights – the only constitutional violation alleged in this case.  As a result, his Monell claim fails as a matter of law.

**IV.  MWA Claim**

Baker claims that the City violated the MWA by allowing Guiton to threaten him, placing him on a PIP, and forcing him to resign.

The MWA protects an employee who, in "good faith, reports a violation, suspected violation, or planned violation of any federal or state law ...."  Minn. Stat. § 181.932, subdiv. 1(1).  The court analyzes MWA claims under the framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Buytendorp v. Extendicare Health Servs., Inc., 498 F.3d 826, 834 (8th Cir. 2007); Cokley v. City of Otsego, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001).  Under McDonnell Douglas, a plaintiff must make a prima facie showing of an MWA violation by proving that (1) he engaged in a statutorily protected activity, (2) he suffered an adverse employment action, and (3) there is a causal connection between the two.  Eliserio v. United Steelworkers of Am. Local

310, 398 F.3d 1071, 1078-79 (8th Cir. 2005); Cokley, 623 N.W.2d at 630.

Even if Baker engaged in statutorily protected activity by addressing his concerns about paramedic training, he cannot establish that he suffered an adverse employment action tied to that activity for the reasons already stated above. As a result, his MWA claim also fails.


### CONCLUSION

Accordingly, **IT IS HEREBY ORDERED that:**

1.   The motion for summary judgment [ECF No. 73] is granted;

2.   The motion to exclude expert testimony [ECF No. 121] is denied as moot; and

3.   The case is dismissed with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: December 20, 2023

s/David S. Doty
David S. Doty, Judge
United States District Court